**Lilly Mae Onie Lee Whitelaw HILLIARD, Plaintiff-Appellant,**

v.

**John L. WILLIAMS, Defendant-Appellee.**

**No. 71-1983.**

United States Court of Appeals, Sixth Circuit.

June 28, 1972.

As Amended July 31, 1972.

Certiorari Denied Nov. 20, 1972. See 93 S.Ct. 461.

Dwayne D. Maddox Huntington, Tenn., Julian P. Guinn, Paris, Tenn., on brief, for plaintiff-appellant.

Bart Durham, Asst. Atty. Gen., David M. Pack, Atty. Gen., Nashville, Tenn., on brief for defendant-appellee.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and McALLISTER, Senior Circuit Judge.

PHILLIPS, Chief Judge.

To what extent does a prosecuting attorney have civil immunity in a suit filed by a defendant whom he has prosecuted in a criminal proceeding? This recurring question is presented on the present appeal.

The defendant-appellee is the District Attorney General for the Twenty-sixth Judicial District of Tennessee. He was prosecuting attorney at a trial resulting in the conviction of plaintiff-appellant Hilliard for second degree murder. This conviction was reversed by the Tennessee Court of Criminal Appeals on April 15, 1971. At the second trial Mrs. Hilliard was acquitted. In the meantime she had served one year in prison.

The evidence upon which Mrs. Hilliard was convicted at her first trial was entirely circumstantial. A key issue was whether stains on the nylon jacket worn by her at the time of her arrest were blood stains, and if so, whether the stains were from human blood as contended by the prosecution or hog blood as contended by the defense.

In reversing the conviction, the Tennessee Court of Criminal Appeals said:

"Of quite devastating impact tending to show guilt was the fact that the defendant had what appeared to be blood stains on her jacket. The State introduced proof of this, and then it was revealed that the jacket itself had been sent to the F.B.I. laboratory in Washington D. C. for chemical analysis and, although some three months had passed since the jacket had been taken from the defendant, it had not been returned for use at the trial; nor was there any information available to shed light on the vital issue of whether the blood was human as theorized by the State or hog as theorized by Mrs. Hilliard.

"Although, as aforesaid, no opportunity was allowed the trial court to correct any error that might have been involved in allowing the State's proof concerning the blood being on the jacket when it developed that the jacket itself was, by State action, unavailable, and thus we cannot consider the propriety of the court's rulings on the objections made during trial; the impact of this testimony does enter into our decision. The proof offered by the State relative to this blood was circumstantial as was all the other. But here there was an opportunity to make available to the jury direct

proof, in the face of the defendant's testimony that the blood was that of a hog, that would have supported one theory and discredited the other. Either the blood was human or swine. It is had been established as human, this would have left little room for doubt that the defendant was not telling the truth in her explanation of how she got blood on her clothing. If it developed that the blood was from a hog, this would have proved conclusively that she was telling the truth, in this particular at least.

"Certainly the two hypotheses suggested by the proof of blood on the jacket—one tending strongly to suggest guilt, the other tending to support the theory of the defendant—are equally reasonable. In its present condition the evidence offered by the defendant buttressed by the presumption of innocence never overcome by sufficient proof preponderates against the verdict."

Following her acquittal at the second trial, Mrs. Hilliard filed the present civil action for damages against the District Attorney General. Jurisdiction is asserted both on the ground of diversity of citizenship and under the civil rights act, 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).[1]

The District Attorney General filed a motion to dismiss pursuant to Rule 12(b) (6), Fed.R.Civ.P. for failure to state a claim on which relief can be granted. The District Court sustained this motion, holding that the District Attorney General is immune from civil liability. We reverse, holding that the District Court erred in ruling that the complaint does not state a claim on which relief can be granted.

This is an interlocutory appeal under 28 U.S.C. § 1292(b). The District Court certified that the order of dismissal involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation. The District Court also directed the entry of final judgment as to the District Attorney General, making an express determination that there is no just reason for delay. Rule 54(b), Fed.R.Civ.P. This court granted leave to appeal.

■■ Our reversal is based entirely upon the factual averments of the complaint, which are summarized hereinafter in this opinion. These averments must be treated as true for purposes of this appeal and are viewed in the light most favorable to Mrs. Hilliard. Lucarell v. McNair, 453 F.2d 836 (6th Cir. 1972), L'Orange v. Medical Protective Society, 394 F.2d 57, 59 (6th Cir. 1968). "In appraising the sufficiency of this complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L. Ed.2d 80 (1957).

The complaint avers that Mrs. Hilliard is a citizen of Indiana; on or about December 24, 1969, she arrived in Carroll County, Tennessee, to visit her maternal aunt, Vina Prince, and the aunt's husband, Ernie Prince; the purpose of her visit was to assert and settle her claim to a one-half interest in certain real estate inherited from her grandmother; Ernie Prince had operated the land for many years and had claimed ownership from time to time; on February 19, 1970, Ernie Prince was killed and Mrs. Hilliard was arrested and charged with his murder.

The complaint further states that at the time of her arrest Mrs. Hilliard was wearing a blue nylon jacket which the officers claimed was stained with the

---

1. The other defendant is the Resident Agent of the Tennessee Bureau of Investigation, who filed an answer in the District Court. He is not a party on this appeal.

blood of Ernie Prince; the victim was murdered by two vicious axe blows to the skull, and the body thereafter was dragged to the rear of the house and shot in the mouth with a shot gun. Mrs. Hilliard asserted that when she was arrested there was no blood on her jacket, but if there were any such stains it was hog blood from preparing raw meat.

The complaint asserts that circumstantial evidence pointed the finger of guilt to Vina Prince, who is insane. The opinion of the State Court of Criminal Appeals pointed out that Mrs. Prince was not available as a witness, due to her mental condition. The court commented:

"It is regrettable that she was not available as a witness . . . Since there is no doubt that this woman was present before, during, and after the assault of the deceased, her potential as a witness is quite evident. She could have witnessed the crime or have committed the crime herself."

It is averred that the only probative material evidence against Mrs. Hilliard was the allegedly blood stained jacket and some allegedly blood stained curtains; that the jacket and curtains were sent to the FBI laboratory in Washington, D. C., for analysis; that the FBI report was negative as to human blood, or any blood, being on either the jacket or the curtains; that the District Attorney General saw the FBI report well in advance of the trial and was familiar with its contents; that neither the FBI report nor the jacket and curtains were made available to be introduced in evidence at the trial; that the contents of the FBI report were never divulged to Mrs. Hilliard or her attorney; instead, it was claimed by the prosecution that the jacket and curtains had been resubmitted to the FBI on April 28, 1970, at a time when the trial already had been set for May 15, 1970, too late for them to be returned in time for introduction in evidence; that the District Attorney General produced evidence before the jury to the effect that the spots on the jacket and curtains "looked like" or "appeared to be" blood stains, in spite of the FBI report that there were no blood stains; that the District Attorney General suppressed and concealed the positive proof that there was no blood on either the jacket or curtains; and that if the FBI report had been introduced into evidence, Mrs. Hilliard would have been acquitted at her first trial as she was at the second.

The complaint further contains these averments:

"22. That in the preparation of the case, the Defendant Williams advised or suggested or implied by some means that the witness Defendant Clark and perhaps others, should not mention anything about the first report of March 28, 1970, and that the Defendant Clark and other witnesses followed his instructions and answered both direct examination questions and cross-examination questions evasively, deliberately misleadingly, with half truths and in instances falsely, to carry out the complete suppression of the report of negative blood analysis of the items.

"23. That the Defendant Williams to carry out his intention of concealing and suppressing the report, contrary to any interpretation of good practice, and knowing that the defense expected the production of the jacket and report of the examination thereof for human blood, the Complainant insisting that there was no blood or if blood then animal blood, not human, announced that the State was ready for trial well knowing he was not going to offer the jacket or curtains or the report, and that once the trial had commenced, the Complainant's defense counsel could not obtain the jacket or any report in time to use it for defense evidence in the trial, and thus suppressing and concealing the evidence which would acquit the Complainant.

"24. That the Defendant Williams when the Complainant's defense counsel demanded the production of the

jacket, or a continuance until it could be produced, knowingly and deliberately advised the Court that through no fault of the State or prosecutors the jacket was not immediately available, as a witness had testified, when he knew or should have known by diligent inquiry that the same was in the T.B.I. office in Nashville, and would have required only two and one-half (2½) hours to be available, and he well knew that the jacket was deliberately sent off on such a late date that its return by trial date was impossible, and he knew of the materiality of the jacket and report and should have announced its unavailability before commencement of the trial, and by these actions suppressed and concealed the evidence of the jacket and report favorable to the Complainant.

"25. That the Defendant Williams knowingly procured and allowed witnesses such as the Defendant Donn Clark and perhaps others to mislead and deceive the Jury, Court, and criminal Defendant and her counsel, when he was aware of stronger evidence than that elicited from his witnesses, which was favorable to the criminal defendant, and failed and refused to reveal the favorable evidence and allowed the evidence he knew to be false to form the basis of the Complainant's conviction of murder in the second degree.

"26. That both Defendants continued to suppress and conceal the report from the complainant's defense counsel, after the trial was concluded, knowing that the same would constitute a basis for a new trial for the Complainant and only disclosed the report when compelled by the opinion of the Court of Criminal Appeals which required that they do so, then revealing the same for the first time the 20th day of April, 1971.

"27. That the Defendants and each of them, by the suppression and concealment, and by trickery, deceit, fraud, unethical practices and conduct for a public official, contrary to their oath of office and in violation of the Defendant's right to a fair trial and due process, were the direct and proximate cause of the Complainant being illegally and unlawfully confined in either the Carroll County Jail or the State Women's Prison in Nashville, and wrongfully deprived of her liberty and freedom, and further the direct and proximate cause of unbelievable mental pain and anguish as a result of being unlawfully and wrongfully imprisoned and branded forever as a convicted murderess, suffered day and night behind prison bars and of her earnings during the period of illegal confinement, which is not yet at an end, but which commenced May 12, 1970.

"28. That thereafter, beginning on the 12th day of May, 1971, the complainant was retried in the Circuit Court of Carroll County, Tennessee, on the charge of murder, the said retrial being concluded on May 13, 1971, by a jury verdict of not guilty.

"29. That the complainant and her counsel on that retrial had the use and benefit, knowledge, and probative evidentiary document and report dated March 26, 1970, from the F.B.I. Laboratory, to the effect that their scientific examination revealed no evidence of any blood, of any kind, human or animal, and in the said re-trial all material aspects of the proof were the same except as to the said report.

\*　\*　\*　\*　\*　\*

"32. That the defendants individually, and jointly, by conspiring, combination, consort and agreement did conspire for the purpose of depriving either directly or indirectly, the complainant of the equal protection of the laws and of equal privileges and immunities under the laws; and under color of a state statute, ordinance, regulation, custom and usage of the State of Tennessee, caused the complainant to be subjected to the deprivation of her rights, provileges and immunities secured by the Constitu-

tion and laws of the United States, and while so doing were acting under color of state authority, and outside the scope of the jurisdiction of their respective offices, and without authority of law and that such actions were calculated or did, in fact, subject the complainant to a deprivation of her constitutional right to a fair trial and due process of law, and were the direct and proximate cause of the injuries, damages, wrongs and loss of liberty and freedom from May 13, 1970, to May 13, 1971, and as set out above."

■ It is well settled that a prosecuting attorney, when acting in his official capacity, is immune from suit for damages, provided that his acts are within the scope of his jurisdiction and authorized by law. Peek v. Mitchell, 419 F.2d 575, 578 (6th Cir. 1970); Hurlburt v. Graham, 323 F.2d 723, 725 (6th Cir. 1963); Kenney v. Fox, 232 F.2d 288, 290 (6th Cir. 1956). See also Kauffman v. Moss, 420 F.2d 1270 (3rd Cir. 1970).

■ However, the immunity of a prosecuting attorney from civil liability is not absolute:

"[A] quasi-judicial officer, such as a prosecuting attorney, who acts outside the scope of his jurisdiction and without authorization of law, cannot shelter himself from liability by the plea that he is acting under color of office." Lewis v. Brautigam, 227 F.2d 124, 129 (5th Cir. 1955).

In McCray v. State of Maryland, 456 F.2d 1, 3 (4th Cir. 1972) the court said:

"The immunity of quasi-judicial officers such as prosecuting attorneys and parole board members derives, not from their formal association with the judicial process, but from the fact that they exercise a discretion similar to that exercised by judges. Like judges, they require the insulation of absolute immunity to assure the courageous exercise of their discretionary duties. Where an official is not called upon to exercise judicial or quasi-judicial discretion, courts have properly refused to extend to him the protection of absolute judicial immunity, regardless of any apparent relationship of his role in the judicial system." (Footnotes omitted)

To like effect see: Madison v. Purdy, 410 F.2d 99, 101 (5th Cir. 1969); Robichaud v. Ronan, 351 F.2d 533 (9th Cir. 1965). Cf. Lucarell v. NcNair, 453 F.2d 836 (6th Cir. 1972); Lynch v. Johnson, 420 F.2d 818 (6th Cir. 1970); Manning v. Ketcham, 58 F.2d 948 (6th Cir. 1932).

See also the order of the Supreme Court denying application for mandamus and certiorari in Garrison v. Brown, 405 U.S. 985, 92 S.Ct. 1253, 31 L.Ed.2d 469 (1972), involving an action for civil damages against District Attorney Jim Garrison of New Orleans for his prosecution of Clay Shaw on the charge of conspiring to assassinate President John F. Kennedy.

The Code of Professional Responsibility adopted by the American Bar Association contains the following provisions with respect to the duties of a public prosecutor:

"EC 7–13 The responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict. This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts. With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to ne-

gate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecution's case or aid the accused."

"DR 7–103 Performing the Duty of Public Prosecutor or Other Government Lawyer.

"(A)  A public prosecutor or other government lawyer shall not institute or cause to be instituted criminal charges when he knows or it is obvious that the charges are not supported by probable cause.

"(B)  A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant, or to the defendant if he has no counsel, of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment."

■  We hold that factual averments of the complaint as summarized above, considered in a light most favorable to plaintiff, charge the District Attorney General with acts which were outside his quasi-judicial capacity and beyond the scope of "duties constituting an integral part of the judicial process." We are not willing to extend the doctrine of quasi-judicial immunity to a complaint charging deliberate suppression of an FBI laboratory report establishing the innocence of the defendant.

Nothing in this opinion is intended to express any view as to the merits of the case. We do no more than hold that the District Judge erred in dismissing for failure to state a claim on which relief can be granted.

Reversed and remanded.